1

**THE ALEXANDER FIRM P.C.**
A Professional Law Corporation

2

Vahn Alexander (167373)

3

1875 Century Park East, Suite 700
Los Angeles, CA  90067

4

Telephone: (310) 407-5335
Facsimile: (310) 407-5338

5

Email: info@alexanderfirmpc.com

6

*Attorneys for Plaintiff*

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

——————————————————— X   Case No._____

11

ROSS WEINTRAUB, Derivatively on Behalf of Nominal
Defendant TESLA MOTORS, INC.,            **VERIFIED SHAREHOLDER**

12

                          Plaintiff,            **DERIVATIVE COMPLAINT**

13

          v.                          <u>JURY TRIAL DEMANDED</u>

14

ELON MUSK, BRAD W. BUSS, IRA EHRENPREIS,
ANTONIO J. GRACIAS, STEVE JURVETSON,

15

HARALD KROEGER, and KIMBAL MUSK,
                          Defendants,

16

17

          -and-

18

TESLA MOTORS, INC., a Delaware corporation,

19

                    Nominal Defendant.

20

——————————————————— X

21

22

23

24

25

26

1

27

28

Plaintiff Ross Weintraub ("Plaintiff"), by his attorneys, alleges for his Verified Shareholder Derivative Complaint against defendants upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys, as follows:

## SUMMARY OF THE ACTION

1.     This a shareholder's derivative action brought on behalf of nominal defendant Tesla Motors, Inc. ("Tesla" or the "Company"), by one of its shareholders against certain of the Company's officers and members of its Board of Directors (the "Board"), alleging that these officers and directors (collectively, the "Individual Defendants" as defined herein) breached their fiduciary duties by failing to ensure that the Company had adequate internal controls and oversight mechanisms and willfully and/or recklessly causing or allowing the Company to issue false and misleading statements or failing to disclose material adverse facts about Tesla's business, operations and future prospects.

2.     Tesla's website boasts that the Company was founded "by a group of intrepid Silicon Valley engineers who set out to prove that electric vehicles could be awesome."  The Company claims to "challenge custom and question tradition" in the conduct of its business, diverging from the customary and well-established practices of other automobile companies.

3.     Following the financial crisis, Tesla co-founder, Elon Musk ("E. Musk"), gained operational control over Tesla, adding the role of Chief Executive Officer ("CEO") in October 2008 to his titles of Chairman and Product Architect.  In this capacity, E. Musk oversaw daily operations, including production of Tesla's first vehicle, the Roadster, which it had launched in 2008, and the development of its second vehicle, the Model S, which it later launched in 2012.

4.     The popularity of Tesla's vehicles in the marketplace has been marginal at best. Only 2,500 Roadsters were sold during the four year period from 2008-2012.  Roadster production ended in January 2012.  Tesla began delivering Model S vehicles in June 2012.  By

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

August 7, 2013, Tesla had sold only about 13,000 Model S cars.   The number of Model S vehicles sold rose to just 25,000 by December 31, 2013.

5.      Notably, by summer 2013, Tesla had never reported a net profit on its audited GAAP financial statements.   Thus, to fund operations, Tesla relied on two sources of capital: (i) funds raised through accessing the capital and debt markets; and (ii) the payments from Zero Emissions Vehicle ("ZEV") credits it sold to other automakers.[1]   However, as the relevant time period began, both of these sources had been fully tapped, such that it was incumbent upon Tesla to ramp up the sales volume of the Model S, its **only** product available for sale.

6.      In spite of its very limited track record, by August 2013, Tesla began touting the Model S's performance in certain government-sanctioned safety testing in order to boost sales of the fledgling vehicle.   In particular, the U.S. Department of Transportation's National Highway Traffic Safety Administration ("NHTSA") gave the Model S a Five-Star Rating in a limited crash testing in or about August 2013.

7.      From this point forward, the Individual Defendants allowed the Company to embark on a campaign of false and misleading statements designed to convince the market that the Model S was literally the safest car in existence, that it had outscored other five-star automobiles and that it had achieved a record composite score.   Indeed, the first of such press releases was issued by Tesla on August 19, 2013, and was falsely titled, "Tesla Model S Achieves Best Safety Rating Of Any Car Ever Tested."

8.      The Company's marketing campaign caused the NHTSA to criticize Tesla's characterization of the government's safety rating and to issue a rare clarification of its rating system.   Moreover, Clarence Ditlow, the director of the Center of Auto Safety called Tesla's spin

---

[1] To combat air pollution, the California Air Resources Board requires all carmakers to sell a certain number of electric vehicles in the state.   Those that fail to reach the quota can purchase ZEV credits from other automakers, like Tesla, in the open market.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

on the score misleading, noting that: "No matter what, you ***can't*** say it's the safest car ever tested."[2]

9.      In addition to allowing Tesla to mischaracterize the Model S's Five-Star Rating, the Individual Defendants also caused or allowed the Company to misrepresent the low height and configuration of the Model S battery pack as enhancing the vehicle's safety, without disclosing its very significant vulnerabilities for high-intensity fires.

10.      In fact, the Individual Defendants egregiously allowed the Company to misrepresent the Model S's history of fire incidents which included at least three very significant fires requiring first responder intervention.  Two of the fires resulted from spontaneous ignitions of batteries.  A third fire was from a Tesla crash test that spiraled into an out-of-control blaze, and was attributed to "failure of equipment or heat source."

11.      Nevertheless, defendant E. Musk falsely claimed that "[t]hroughout all our crash tests, throughout all similar incidents with vehicles on the road, ***never once has there been a fire.***"  When a Model S fire later occurred during the relevant time period, a Tesla spokesperson falsely stated, "This is the ***first*** fire."  Thus, by the third Model S fire, the Individual Defendants were still causing or allowing Tesla to represent that there were low probabilities of such fires while simultaneously denying that a recall was necessary.

12.      They claimed that Tesla had independently ensured through rigorous testing that ***all*** parts of the Model S were 5-star safe, stating: "After verifying through internal testing that the Model S would achieve a NHTSA 5-star rating, Tesla then analyzed the Model S to determine the weakest points on the car and retested at those locations until the car achieved 5 stars no matter how the test equipment was configured."

13.      Despite these efforts to understate the risk of catastrophic damage to Tesla's Model S fleet from undercarriage puncture and to conceal prior battery fires, widely publicized

---

[2] At all times, emphasis is added unless otherwise indicated.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

reports of fire incidents involving the Model S during October and November 2013 caused Tesla's share price to plummet.

14.     First, investors were shocked when a Model S was completely destroyed on October 2, 2013, due to an undercarriage puncture and high-intensity battery pack fire caused by a collision with road debris in the state of Washington.  While Tesla initially denied that the car's battery pack had ignited the fire, it later reversed course and admitted that the battery pack was indeed the source of the blaze after being punctured by road debris encountered during normal driving conditions.  On the negative news, Tesla stock declined $12.05 per share or more than 6%, to close at $180.95 per share on October 2, 2013, only to drop another $7.64 per share (or 4.2%) to close at $173.31 per share on October 3, 2013, amid derisive press coverage of the fire and on high volume both days.

15.     In seeking to reassure investors, the Individual Defendants caused the Company to downplay this incident.  Indeed, defendant E. Musk gave several interviews during which he downplayed this Model S fire and worse, failed to disclose that another Model S had been consumed by fire in Mexico on October 18, 2013.  It has even been alleged in the related federal securities class action lawsuit[3] that individuals at Tesla were immediately aware of the fire and sent a team to inspect the vehicle before defendant E. Musk made his foregoing representations to the public.  According to allegations in the Federal Securities Action, defendant E. Musk, with knowledge of the fire and inspection, unilaterally determined that the fire was not relevant to investors due to the circumstances under which it arose.  However, when the public finally learned of the incident on October 28, 2013, Tesla's shares again plummeted, dropping $7.32 (4.3%) on heavy volume to close at $162.86.

16.     On November 7, 2013, yet another Model S was destroyed by a high-intensity battery fire after road debris punctured its undercarriage under normal driving conditions, this

---

[3] *In re Tesla Motors, Inc. Securities Litigation,* Case No. 3:13-cv-05216-CRB (N.D. Cal.) ("Federal Securities Action").

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

time in Tennessee.  Once again, Tesla's stock price fell, closing at $139.77, down $4.42 (3.06%) from its opening price of $144.19, on heavy volume.

17.    Thereafter, federal regulators opened an investigation and the Individual Defendants were forced to admit the vulnerabilities of the Model S as it had been introduced to the marketplace when, on November 18, 2013, Tesla issued an over-the-air software update that lifted the Model S's driving height at highway speeds and expanded the Model S's warranty to cover damage from battery fires.  On this news, on November 18, 2013, Tesla's stock price dropped $13.87 to close at $121.58.

18.    The Individual Defendants' wrongful conduct has significantly and materially damaged the Company.  By virtue of the Individual Defendants' breaches of fiduciary duties, the Company faces a lawsuit alleging violations of the federal securities laws and Tesla has suffered significant disruption of, and damage to, its business, its reputation and goodwill.

19.    As a result of the misconduct described herein, current members of Tesla's Board are antagonistic to this lawsuit such that making a demand on the Board would be futile.  Each of the Individual Defendants faces a substantial likelihood of non-exculpated liability for their breaches of fiduciary duty disabling the current Board members from impartially considering the subject matter of this lawsuit.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between Plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with California so as to render

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1   the exercise of jurisdiction by this Court permissible under traditional notions of fair play and

2   substantial justice.

3        22.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more

4   of the defendants either resides in or maintains executive offices in this District, a substantial

5   portion of the transactions and wrongs complained of herein, including defendants' primary

6   participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in

7   violation of fiduciary duties owed to Tesla, occurred in this District and defendants have

8   received substantial compensation in this District by doing business here and engaging in

9   numerous activities that have an effect in this District.

10                                            **PARTIES**

11       23.    Plaintiff is, and at all relevant times was, a shareholder of nominal defendant

12  Tesla.  Plaintiff is a citizen of Pennsylvania.

13       24.    Nominal defendant Tesla is a Delaware corporation with its headquarters at 3500

14  Deer Creek Road, Palo Alto, California 94304.  Tesla was founded in 2003 and went public on

15  June 29, 2010.  Tesla utilizes a proprietary technology to create highway capable electric

16  vehicles.  The Company's Tesla Roadster entered production in 2008 and its Model S in 2012.

17  Tesla sells its vehicles through Company-owned sales and service centers.  Tesla is a citizen of

18  both Delaware and California.

19       25.    Defendant Elon Musk ("E. Musk") is the Chairman, Product Architect and Chief

20  Executive Officer of Tesla.  E. Musk co-founded Tesla and continues to oversee the company's

21  product strategy -- including the design, engineering and manufacturing aspects of the business.

22  As Chairman and Product Architect, E. Musk helped design the Company's Tesla Roadster.  In

23  October 2008, he took on the additional responsibility of CEO, overseeing daily operations as the

24  Company was ramping up Roadster production and accelerating the development of its second

25  vehicle, the Model S.  E. Musk launched Tesla's regional sales and service centers across two

26  continents and in May 2009 secured a $50 million investment and strategic partnership from

27

28                                                 7
                        **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Germany's Daimler.  According to the Company's website, E. Musk spearheaded a successful cost-down program that enabled Tesla to achieve profitability in July 2009. He guides development of the Model S, the all-electric family sedan that is produced at the Tesla Factory in Northern California.  The Tesla Factory employs approximately 1,000 workers.  In addition to his Tesla duties, he serves as CEO and CTO of SpaceX, and E. Musk is also the Chairman of SolarCity.  Upon information and belief, E. Musk is a citizen of California.

26.     Defendant Brad W. Buss ("Buss") currently is and has been since 2009, a director of Tesla.  Buss also serves on the Company's Nominating and Governance Committee, the Compensation Committee and is Chairman of the Audit Committee.  Buss has been chief financial officer, corporate secretary and executive vice president of finance and administration at Cypress Semiconductor Corp. since August 2005.  Before joining Cypress, Buss was vice president of finance at semiconductor company Altera Corp., where he was active in all aspects of the business including forging alliances and guiding strategic direction for global supply chain and sales channel management.  Upon information and belief, Buss is a citizen of California.

27.     Defendant Ira Ehrenpreis ("Ehrenpreis") is and has been since 2007, a director of Tesla.  Ehrenpreis also serves as Chairman of both the Company's Nominating and Governance Committee and the Compensation Committee.  Ehrenpreis has been General Partner with Technology Partners since 1996.  He leads the firm's Cleantech investment practice, investing in Energy Technology, Water Technology, and Advanced Materials opportunities.  In the venture capital community, Ehrenpreis serves on the Board and Executive Committee of the National Venture Capital Association ("NVCA") and on the Board of the Western Association of Venture Capitalists ("WAVC").  He is also the Co-Chairman of both the VCNetwork and the YVCA, two non-profit organizations comprising more than 1,000 venture capitalists.  In the Cleantech sector, Ehrenpreis has served on several industry Boards, including the Clean-Tech Investor Summit (2005, 2006, 2007, 2008, 2009, and 2010 Conference Chairman), Cleantech Venture Network (Past Chairman of Advisory Board), ACORE (American Council on Renewable Energy), Energy

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Investors Forum (Past Conference Chairman), Energy Venture Fair, and California Climate Change Advisory Board.  He has also served on the Advisory Boards of the Southern California Tech Coast Alliance, Forum for Women Entrepreneurs (FWE), and the Comerica Venture Capital Advisory Board.  Ehrenpreis is also an active leader at Stanford University, where his contributions have included teaching the course on Venture Capital and serving on the Board of Visitors of Stanford Law School.  Upon information and belief, Ehrenpreis is a citizen of California.

28.     Defendant Antonio J. Gracias ("Gracias") is and has been since 2007, a director of Tesla.  Gracias is also a member of the Company's Audit Committee, the Nominating and Governance Committee and the Compensation Committee and serves as the Board's Lead Independent Director.  Gracias also serves as Valor's Chief Executive Officer and Chairman of the Investment Committee.  His duties include overall responsibility for the Firm's management, operations, and investing.  These include but are not limited to: human resources, management of the Firm's board, raising capital, limited partner communication, deal generation, investment selection, investment strategy, investment committee management, transaction structuring, and portfolio company management and improvement.  Gracias has over 15 years of experience investing in a variety of sectors including private equity, public equity, and real estate transactions.  Gracias is Valor's Founder and Chief Executive Officer.  Prior to founding Valor in 2001, Mr. Gracias served as Founder and Managing Member of MG Capital from 1995 through 2000.  MG Capital was a private equity firm headquartered in Chicago, Illinois.  As the lead transaction principal, Gracias sourced investments in nine middle market manufacturing companies where MG Capital played the role of lead equity sponsor.  In addition, Gracias served as Chief Executive Officer of Industrial Powder Coatings, Inc., a $65 million revenue supplier to the auto parts and appliance sectors. Prior to MG Capital, Gracias was an Associate with Goldman, Sachs & Co. in New York where he served the firm's institutional clients in the International Equity Division.  Gracias is a member of the Commercial Club of Chicago, a

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

member of the Board of Directors of the Grand Victoria Foundation, a member of the Board of Trustees of the Illinois Institute of Technology, a member of the Board of Directors of The Economic Club of Chicago, a Trustee of the Field Museum, and a member of the Board of Visitors of the University of Chicago Law School.  Upon information and belief, Gracias is a citizen of Illinois.

29.    Defendant Steve Jurvetson ("Jurvetson") is and has been since 2009, a director of Tesla.  Jurvetson is also a member of the Company's Audit Committee.  Jurvetson is a managing director of Draper Fisher Jurvetson, a venture capital firm and one of the most active energy and clean tech investors, with affiliate offices around the world and $6 billion under management. Jurvetson was the founding venture investor in Hotmail, Interwoven and Kana.  He also led the firm's investments in Tradex and Cyras.  Previously, he was an R&D engineer at Hewlett-Packard, where seven of his communications chip designs were fabricated.  His prior technical experience also includes programming, materials science research and computer design at HP, the Center for Materials Research, and Mostek.  He has also worked in product marketing at Apple and NeXT.  Upon information and belief, Jurvetson is a citizen of California.

30.    Defendant Harald Kroeger ("Kroeger") was a director of Tesla from 2012 until June 3, 2014.  Kroeger is responsible for development of electrics and electronics of all Mercedes-Benz cars.  In addition, as a vice president within Mercedes, he is the head of development for electric vehicles, electric motors, high voltage batteries and power electronics. Before this assignment, Kroeger was head of quality management for Mercedes-Benz, managing quality in product design, product development, manufacturing, sales and after sales, as well as overall supplier quality management.  Kroeger started his career with Daimler-Benz in 1995 in research and development, working on radar technologies for vehicles.  After assignments in different Mercedes plants in South Africa and Germany, Kroeger was named as head of purchasing for electrics and electronics, with responsibility for more than $5 billion worth of purchased material, as well as managing the global purchasing alliance with Chrysler and

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1  Mitsubishi for all E/E components.  Before joining Mercedes, Kroeger worked for Philips AG in

2  1993 in research on electric motors, holding patents on foil motors.  Upon information and

3  belief, Kroeger is a citizen of California.

4       31.    Defendant Kimbal Musk ("K. Musk") is and has been since 2004, a director of

5  Tesla and is the brother of defendant E. Musk.  K. Musk is also CEO of Medium, Inc., an

6  internet software company based in Boulder, Colorado. K. Musk and his brother, E. Musk,

7  started their first company, Zip2, an early content management company for the Internet, in

8  1995.  It was the first company to bring vector-based maps and door-to-door directions to the

9  internet, and it built the online content management systems behind more than 100 media

10  companies, including *The New York Times*.  Zip2 was sold for $307 million in cash in 1999, one

11  of the largest transactions of its kind in the internet industry at the time.  Since then, K. Musk has

12  helped found, advised, and invested in several young companies.  His prior and current board

13  seats, in addition to Tesla Motors, are Medium, Inc., Everdream Corp., BlackBook Media,

14  SpaceX Corp., and ProgressNow.org.  Upon information and belief, K. Musk is a citizen of

15  Colorado.

16       32.    The defendants identified in ¶¶ 25 to 31 are referred to herein as the "Individual

17  Defendants."

18              **DUTIES OF THE INDIVIDUAL DEFENDANTS**

19       33.    By reason of their positions as officers, directors and/or fiduciaries of Tesla and

20  because of their ability to control the business and corporate affairs of the Company, the

21  Individual Defendants owed Tesla and its shareholders fiduciary obligations of trust, loyalty,

22  good faith and due care, and were and are required to use their utmost ability to control and

23  manage Tesla in a fair, just, honest and equitable manner.  The Individual Defendants were and

24  are required to act in furtherance of the best interests of Tesla and its shareholders so as to

25  benefit all shareholders equally and not in furtherance of their personal interest or benefit.

26

27

28

34.     Each director and officer of the Company also owes to Tesla and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Tesla, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial and directorial positions with Tesla, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper practices of Tesla.

36.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Tesla, and was at all times acting within the course and scope of such agency.

37.     To discharge their duties, the officers and directors of Tesla were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Tesla were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)  remain informed as to how Tesla conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(e)  ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

38.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Tesla, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the relevant time period has been ratified by the remaining Individual Defendants who collectively comprised all of Tesla's Board during the relevant time period.

39.  The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its business, operations and prospects as detailed herein, by failing to properly oversee the Company's business and operations, and by failing to prevent the Individual Defendants from taking such illegal actions.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

40.  The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct by causing the Company to conceal the true facts as alleged herein.

41.  The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law and breaches of fiduciary, to conceal adverse information concerning the Company's operations, financial condition and future business prospects, and to artificially inflate the price

of Tesla common stock so the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

42.  The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently fail to maintain effective internal control policies and procedures with respect to the Company's public statements to its shareholders and the investing community. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

43.  Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

44.  At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Tesla, and was at all times acting within the course and scope of such agency.

## FACTUAL ALLEGATIONS

### Tesla's Operational Problems

45.  Tesla was formed by Silicon Valley entrepreneurs in 2003 with the goal of developing, marketing and selling fully electric automobiles. By October 2008, Tesla was controlled by defendant E. Musk, who, despite having no prior background in the automobile industry, added the title CEO to his titles of Chairman and "Product Architect."

46.    Tesla designs, manufactures, markets, and thus far has sold, just two fully electric vehicles – the Roadster and the Model S.  In addition, it designs, manufactures and sells electric vehicle powertrain components to more traditional automobile manufactures for use in their own electric fleets.

47.    Tesla acknowledges that its proprietary electric vehicle powertrain system is the foundation of its entire business.  *See* Form 10-K for the period ended December 31, 2012.  This system was developed for the Roadster, modified for the Model S, and will be used in Tesla's future electric vehicles, including the Model X.  Given its importance to Tesla's business, the Individual Defendants knew that any material defect or critical vulnerability to this electric powertrain system, if exposed, would pose a massive threat to Tesla's reputation and business prospects.

48.    During the period from 2008-2012, Tesla sold only 2,500 Roadsters.  From June 2012 through August 7, 2013, Tesla had only sold about 13,000 of its Model S vehicles.  By August 2013, Tesla had never reported a net profit on its audited GAAP financial statements and it was incumbent upon the Company to ramp up sales of the Model S – its ***only*** product available for sale.

49.    However, at the time and undisclosed to investors, Tesla was experiencing numerous operational problems.  It has been alleged in the Federal Securities Acton that many of these problems were caused in large part by defendant E. Musk's edicts regarding stringent design and production deadlines which in turn caused Tesla employees to operate at a frenetic pace and to make critical errors, compromising the Model S's safety.  According to confidential witness reports as set forth in the Federal Securities Action, Tesla was struggling to obtain sufficient parts to build cars, thereby forcing the Company to use preliminary parts in Model S cars sold to the public and parts that had not undergone sufficient validation tests to ascertain performance through the life of the vehicle.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

50.     Other confidential witnesses allegedly reported that defendant E. Musk, despite lacking any advanced engineering degree, was heavily involved in the development of the Model S and made major decisions about its engineering and design, sometimes rejecting the recommendations of Tesla's own engineers.  Notably, one confidential witness allegedly described in detail how defendant E. Musk's mandate for a 300 mile per battery charge range for the Model S, required Tesla's engineers to use higher-energy batteries.  Although these batteries would reach E. Musk's stated 300-mile range, they were more volatile and could lead to bigger and more violent thermal events.

51.     Nevertheless, and even with knowledge of the inherent risks of placing these batteries along the bottom of the Model S just inches above the road, the Company, with E. Musk at the helm, made the decision to reject available technologies and approaches that would have increased the durability of the Model S's undercarriage and increased the fire protection for its battery pack.

52.     For example, Tesla discontinued use of individual sleeves for the Model S's batteries, a technology that had been employed in the Roadster.  Further, Tesla opted essentially to preserve its pre-existing battery pack design and configuration, even after it opted to use higher-energy batteries.  Moreover, Tesla did not implement stronger undercarriage plating that was available for inclusion in the Model S.  Finally, Tesla designed and programmed the Model S to automatically lower its own driving height once the vehicle reached 55 miles per hour, in an effort to reduce drag and increase the mileage range.  The obvious consequence of lowering the car is that there is an increased likelihood of road debris hitting the undercarriage which could damage the battery and cause a fire.

53.     Confidential witnesses interviewed in the Federal Securities Action allegedly described a series of significant battery fire incidents, planned and unplanned, during design and pre-production of the Model S which leave no doubt that the Individual Defendants were fully aware of the risk associated with battery fires in the Model S.  The first fire purportedly occurred

16

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

in or about September or October 2011 during the build-out of a prototype Model S. The second fire incident reportedly occurred in late 2011 during a test to determine the outcome if a battery pack went into a thermal event and began to burn. The fire department's incident report, as described in the Federal Securities Action, noted that the fire resulted from a Tesla test on the battery packs during a crash fire test, stating: "They intentionally set the vehicle on fire inside a testing building and the fire became larger than they could handle." Another fire incident was reported as having occurred on January 11, 2012 at Tesla's headquarters in Palo Alto. The fire department's report, as identified in the Federal Securities Action, suggests that the fire was spontaneous and that Tesla batteries were involved. *None* of these incidents were disclosed in any Form 8-K or press release, nor did Tesla's Form 10-K for the period ended December 31, 2011, which was filed on February 27, 2012, describe any of these fires.

54. Eventually, Tesla was forced to adopt retroactive measures to remedy the undercarriage and driving height issues by lifting the Model S's height at highway speeds and by retrofitting already-sold Model S cars with a titanium undercarriage shield.

**The NHTSA's Testing of the Model S did Not Assess the Risk of**
**Battery Fires Caused by Undercarriage Puncture**

55. The NHTSA's 5-Star Safety Ratings Program employs only limited testing to generate comparative safety ratings among vehicles. Specifically, the NHTSA performs the following crash tests (in addition to rating the rollover resistance of vehicles):

(a) Frontal crash test. NHTSA performs a frontal crash test, in which a vehicle is crashed into a fixed barrier at thirty-five (35) miles per hour. The test utilizes instruments to measure the impact to various parts of the bodies of two crash test dummies seat belted in the car.

(b) Side barrier crash test. In this test, a barrier moving thirty-eight and one-half (38.5) miles per hour is crashed into the side of a vehicle standing still. The test utilizes instruments to measure the impact to various parts of the bodies of two crash test dummies seat belted in the car.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

(c) Side pole crash test. This test involves a car being angled at 75 degrees and then pulled sideways at twenty (20) miles per hour into a 25-centimeter pole at the driver's seat location. The test utilizes instruments to measure the impact to various parts of the bodies of one crash test dummy belted in the driver's seat.

56. None of these tests assess the fire risk posed by the battery pack of an electric car under any conditions. They do not measure the structural integrity of or damage caused to the battery pack of an electric vehicle as a result of the impacts simulated. They do not evaluate or measure damage to the vehicle as a result of the impacts simulated. They do not evaluate or measure damage to the vehicle or its undercarriage or its protective shield caused by impact with road debris. Nor do these tests generate any data based on a vehicle travelling at highway speeds. Moreover, the NHTSA's fire prevention regulations do not apply to electric cars in that they are written to minimize the amount of gas spilled in a fuel-tank rupture.

57. It was in or about early to mid August 2013 that the NHTSA notified Tesla of the Model S's test results.

**The Individual Defendants Cause or Allow the Company to Issue**
**False and Misleading Statements**

58. As detailed herein, this action arises from the Individuals Defendants' failure to maintain effective internal control policies and procedures with respect to the Company's public statements to its shareholders and the investing community. In particular, the Individual Defendants caused or allowed the Company to misrepresent: (a) the safety rating of one of its two automobiles, the Model S; (b) that Tesla had conducted independent testing that verified that the weakest points on the Model S were five-star safe; (c) the Model S's history of fires and numerous incidents involving fire; and (d) that the Model S's battery pack contributed to its safety while omitting to disclose its significant vulnerabilities to road debris impact, puncture, and catastrophic fire during normal driving conditions due to its undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds. The Individual Defendants also caused or

1  allowed the Company to omit to disclose that Tesla's stock price faced considerable risk as a

2  result of the material misstatements and omissions.

3       59.    On August 19, 2013, after the markets closed, the Individual Defendants caused

4  or allowed Tesla to issue a press release (the "August 19, 2013 Press Release,") in which it

5  touted the Model S's NHTSA test results.  The August 19, 2013 Press Release was intended to

6  serve the dual purpose of establishing proof-of-concept for its all-electric Model S and of

7  increasing sales of the Model S in light of declining ZEV revenues and tapped-out capital and

8  debt market financing.  However, the August 19, 2013 Press Release contained numerous

9  materially false and misleading statements and material omissions.

10       60.    First, the August 19, 2013 Press Release falsely stated, in its title, that the "Tesla

11  Model S Achieves Best Safety Rating Of Any Car Ever Tested."  This was materially false

12  because, as described below, the NHTSA does not further rank cars among all those that earned

13  the 5-star category.

14       61.    Second, the August 19, 2013 Press Release falsely stated, "[S]afety levels better

15  than 5 stars are captured in the overall Vehicle Safety Score (VSS) provided to manufacturers,

16  where the Model S achieved a new combined record of 5.4 stars."   This was materially false

17  because, as described below, the NHTSA does not rate any car above 5 stars.

18       62.    Third, the August 19, 2013 Press Release falsely touted the location and low

19  height of the Model S battery pack as enhancing the vehicle's safety.  Specifically, in touting the

20  Model S's rollover test results, it stated, "The reason for such a good outcome is that the battery

21  pack is mounted below the floor pan, providing a very low center of gravity, which

22  simultaneously ensures exceptional handling and safety."

23       63.    Fourth, the August 19, 2013 Press Release expressly represented that Tesla had

24  redundantly tested the Model S to determine its weakest points and to improve them all so that

25  no part of the vehicle would score under 5 stars in a safety rating.  Such a broad, blanket

26

27

28

statement necessarily encompassed the undercarriage, the battery pack, and the parts of the car

encasing and protecting the battery pack.  Specifically, this press release stated:

> The above results do not tell the full story.  It is possible to game the regulatory testing score to some degree by strengthening a car at the exact locations used by the regulatory testing machines.  After verifying through internal testing that the Model S would achieve a NHTSA 5-star rating, Tesla then analyzed the Model S to determine the weakest points in the car and retested at those locations until the car achieved 5 stars no matter how the test equipment was configured.

64.    In other words, Tesla claimed to have vigorously examined the Model S to

identify its "weakest points" and did not stop testing until they had **all** achieved a perfect 5-star

score.  However, by failing to exclude the undercarriage, the battery pack, and the parts of

the car encasing and protecting the battery pack, Tesla falsely stated that those parts, too, had

achieved the performance levels of a perfect 5-star score.

65.    Fifth, the August 19, 2013 press release also made specific false and misleading

representations as to the safety and reliability of the Model S's battery pack, stating:

> The Model S lithium-ion battery did not catch fire at any time before, during, or after NHTSA testing.  It is worth mentioning that no production Tesla lithium-ion battery has ever caught fire in the Model S or Roadster, despite several high speed impacts.

66.    The first sentence is patently false.  The Model S battery pack caught fire

numerous times before the NHTSA testing, including three significant blazes that required first

responder intervention, as discussed above.  Contemporaneous incident reports prepared by

responding fire departments specifically describe the fire as occurring in the Model S battery

pack.  The second sentence is an extremely misleading statement - by qualifying itself as

speaking only to "production" batteries, this statement is subtly hedged so as to exclude the three

test battery fires discussed above in a way that would be impossible for an investor to

independently discover.

67.    In addition to the foregoing, all five of the above-described statements in the

August 19, 2013 Press Release were materially false and misleading for the additional  reasons

that they failed to disclose the following material information:  (a) Tesla's numerous prior

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

battery fire incidents (as discussed *supra*); (b) the fact that the Model S was highly vulnerable to undercarriage puncture and catastrophic fire during normal driving conditions due to its undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds; and (c) that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

68.     On or about the same time that the August 19, 2013 Press Release was disseminated to the investing public, the Individual Defendants caused or allowed Tesla to revise its corporate website so that the front page displayed the description, "The Safest Car In America" in touting its NHTSA ratings.  As explained herein, the NHTSA's rating system does not rank cars within the 5-star category, and the NHTSA does not actually test many of the Model S's direct luxury-car competitors, such as the Audi A8, the BMW 7 series, and the Mercedes-Benz S-class, all of which are loaded with safety-enhancing features.  Moreover, characterization of the Model S as the "Safest Car In America" is particularly misleading in light of its history of battery fire incidents and the fact that it was highly vulnerable to undercarriage puncture and catastrophic fire due to its undercarriage design and configuration.

69.     On August 20, 2013, defendant E. Musk was interviewed by Yahoo! Autos and the automobile blog Motoramic, during which he discussed the Model S, its battery pack design, its testing results, and its safety record.  During this interview, the Individual Defendants caused or allowed defendant E. Musk to make additional materially false and misleading statements, unaccompanied by any warnings or cautionary statements.  Specifically, in addressing statements in the August 19, 2013 Press Release that the Model S battery pack had no issues before, during or after crash testing, and in light of concerns over lithium-ion battery packs after the grounding of Boeing's 787 airliner, defendant E. Musk stated, "Throughout all our crash tests, throughout all similar incidents with vehicles on the road, never once has there been a fire."  This statement was untrue.  Tesla's batteries had caught fire numerous times before, including three significant

1  events requiring first responder intervention, one of which occurred during Tesla's own crash

2  testing of the Model S.

3       70.    In a September 14, 2013 "Tesla Motors Investor Presentation" bearing a Tesla

4  copyright and the name of Jeff Evanson, Tesla's VP of Investor Relations (the "September 14,

5  2013 Investor Presentation"), Tesla again falsely touted the Model S as being the "Safest Car

6  Ever Tested by NHTSA."

7       71.    In addition, this statement, as well as the September 14, 2013 Investor

8  Presentation's discussion of the Model S's "passive safety features" and "high energy

9  density" were also materially false and misleading because they failed to disclose Tesla's

10  numerous prior battery fire incidents, some of which had occurred during Tesla's crash testing of

11  the Model S, and the fact that the Model S was highly vulnerable to undercarriage puncture and

12  catastrophic fire during normal driving conditions due to its undercarriage design and

13  configuration.

14       72.    On October 3, 2013, the campaign of misinformation continued under the

15  Individual Defendants' watch.  On that day, a Tesla spokesperson, Elizabeth Jarvis-Shean, was

16  quoted by ABC News as stating that a Model S fire in the state of Washington on October 1,

17  2013, was the first known fire caused by a Model S battery.  News reports carried the story on

18  the fire along with imagery of a Model S smoldering on the shoulder of a major highway.  In her

19  interview, she stated, "[T]his is the first fire."  This statement was untrue because the Model S

20  batteries had previously caught fire on numerous occasions.  In spite of their attempt to

21  downplay the fire as an isolated "first time event," the market reacted strongly to news of the

22  Washington state fire and Tesla's stock plummeted 6% or $12.50 per share to close at $180 per

23  share on October 2, 2013, on volume of 20,724,600 shares.

24       73.    The next day, on October 3, 2013, *The New York Times* published an article

25  entitled "Car Fire a Test for High-Flying Tesla," which quoted a battery consultant as saying that

26

27

28

22
**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

the case shielding around the Model S's lithium-ion battery might not have been strong enough to keep the impact with road debris from causing a short circuit.

74.    The *MIT Technology Review* also published an article that day entitled "What Tesla Battery Fire Means for Electric Vehicles," which also raised concerns about the Model S's battery pack.

75.    Tesla's stock price continued to be battered by these reports, dropping $7.64 per share or 4.2% to close at $173.31 per share on October 3, 2012.

76.    Then, on October 4, 2013, defendant E. Musk authored a blog post published on Tesla's website which was linked to Tesla's Twitter account and to defendant E. Musk's personal Twitter account the same day.  He characterized the Washington state fire incident as one that was the result of an unusually strong force penetrating the undercarriage: "The geometry of the object caused a powerful lever action as it went under the car, punching upward and impaling the Model S with a peak force on the order of 25 tons.  Only a force of this magnitude would be strong enough to punch a 3 inch diameter hole through the quarter inch armor plate protecting the base of the vehicle."   Defendant E. Musk also touted the Model S's safety compared to traditional gasoline-powered automobiles under similar circumstances: "Had a conventional gasoline car encountered the same object on the highway, the result could have been far worse. . . .  [T]he effective combustion potential is only about 1% that of the fuel in a comparable gasoline sedan. . . .  [Y]ou are 5 times more likely to experience a fire in a conventional gasoline car than a Tesla."  E. Musk went so far as to even allocate blame for the intensity of the fire to first responders who observed standard operating procedures in extinguishing the fire: "For the Model S Lithium-ion battery, it was correct to apply water (vs. dry chemical extinguisher), but not to puncture the metal firewall, as the newly created holes allowed the flames to vent upwards into the front trunk section of the Model S."

77.    In the blog post, defendant E. Musk also published an email exchange with the driver of the Model S that burned where he described the metal object that punctured the

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

vehicle's undercarriage as a "highly uncommon occurrence" and "something that is extremely hard to do."

78.     As described herein *supra*, these statements were contrary to known facts about the weakness of the Model S undercarriage and battery pack and to Tesla's undisclosed prior battery fires.

79.     On October 22, 2013, the NHTSA issued a statement that, while it had not yet decided whether to open a formal investigation, the agency was "gathering data" and had its experts in contact with Tesla.

80.     Even the threat of a costly formal investigation by the NHTSA did not cause the Individual Defendants to quell statements regarding Model S safety, nor did it cause them to rein in defendant E. Musk who continued to make blatantly false representations about the fire incident in Washington state in particular and, more generally, about the Model's S's risk of fire.

81.     On October 22, 2013, defendant E. Musk gave a speech to Tesla consumers at a Tesla service center in Germany which was videotaped and widely disseminated on the Internet. During the speech he repeated many of the same statements made in his October 4 blog post, including, among other things, that the Washington state fire was a "very peculiar accident" and that Tesla's electric car "is five times less likely to catch fire than a gasoline car."  Similar comments were made by E. Musk during an October 24, 2013 interview on Bloomberg TV.

82.     Notably, while the Individual Defendants continued to allow the Company to falsely praise the safety of its Model S, unbeknownst to investors, a second Model S fire had taken place.  Indeed, on October 28, 2013, media outlets reported that a second Tesla Model S fire had occurred on October 18, 2013 in Merida, Yucatan Peninsula, Mexico.  Once again, video was circulated of a Model S engulfed in flames punctuated by sporadic explosions.  On this news, Tesla's stock price dropped $7.32 or 4.3% on heavy volume to close at $162.86 on October 28, 2013.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

83.     There is no question that the Individual Defendants would have been aware of the second Model S fire.  According to a confidential witness as alleged in the Federal Securities Action, Tesla sent a team of approximately five engineers and technicians on October 21, 2013, which team conducted an on-site investigation for two days.

84.     Disaster once again struck when on November 6, 2013, a Model S operating under normal driving conditions struck road debris and incinerated.  During the morning of November 7, 2013, Tesla confirmed that a third fire in its Model S had occurred, this time in Murfreesboro, Tennessee, the previous afternoon, and that Tesla had already sent a team to Tennessee to investigate.  This was Tesla's third Model S fire in just five weeks.

85.     According to local authorities, the Model S in question was driving under normal conditions when it hit a metal object on the roadway, thought to be a tow hitch.  The object damaged the car's undercarriage and ignited a fire in the battery pack.  The blaze was hot and intense and according to eye witness reports, virtually melted the vehicle to the road.

86.     Media outlets widely reported the story and Tesla's stock was pummeled again, closing at $139.77, down from its prior day's closing price of $151.16, on heavy volume.

87.     The Individual Defendants, however, buried their heads in the sand and allowed the campaign of misinformation to continue.

88.     On November 12, 2013, the Individual Defendants caused or allowed defendant E. Musk, in an interview with CNBC, to make additional false and misleading statements.  After three publicly-known fires in the prior six weeks, and the other undisclosed fires, E. Musk still maintained that the Model S is less likely to have a fire than a gasoline car.  He repeated such statements in interviews that day at the second annual DealBook conference hosted by *The New York Times* and at the Ignition: Future Digital Conference in New York.  The Individual Defendants also caused or allowed E. Musk to deny that there was any reason for a Model S recall, a statement that is wholly false in that Tesla was in fact on the cusp of taking corrective

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

actions, including the raising of the Model S by an over-the-air software update and the retroactive implementation of enhanced undercarriage shielding.

89.     Notably, on November 18, 2013, the Company revealed that it was taking corrective measures to address the problem of Model S fires under normal driving conditions at highway speeds:

> While we believe the evidence is clear that there is no safer car on the road than the Model S, we are taking three specific actions.
>
> First, we have rolled out an over-the-air update to the air suspension that will result in greater ground clearance at highway speeds. To be clear, this is about reducing the chances of underbody impact damage, not improving safety. The theoretical probability of a fire injury is already vanishingly small and the actual number to date is zero. Another software update expected in January will give the driver direct control of the air suspension ride height transitions.
>
> Second, we have requested that the National Highway Traffic Safety Administration conduct a full investigation as soon as possible into the fire incidents. While we think it is highly unlikely, if something is discovered that would result in a material improvement in occupant fire safety, we will immediately apply that change to new cars and offer it as a free retrofit to all existing cars. Given that the incidence of fires in the Model S is far lower than combustion cars and that there have been no resulting injuries, this did not at first seem like a good use of NHTSA's time compared to the hundreds of gasoline fire deaths per year that warrant their attention. However, there is a larger issue at stake: if a false perception about the safety of electric cars is allowed to linger, it will delay the advent of sustainable transport and increase the risk of global climate change, with potentially disastrous consequences worldwide. That cannot be allowed to happen.
>
> Third, to reinforce how strongly we feel about the low risk of fire in our cars, we will be amending our warranty policy to cover damage due to a fire, even if due to driver error. Unless a Model S owner actively tries to destroy the car, they are covered. Our goal here is to eliminate any concern about the cost of such an event and ensure that over time the Model S has the lowest insurance cost of any car at our price point. Either our belief in the safety of our car is correct and this is a minor cost or we are wrong, in which case the right thing is for Tesla to bear the cost rather than the car buyer.
>
> All of these actions are taken in order to make clear the confidence we have in our product and to eliminate any misperceptions regarding the integrity of our technology and the safety of our cars.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DAMAGES TO THE COMPANY**

90.     As a result of the Individual Defendants' improprieties, the Company has suffered, and continues to suffer, extensive damage.

91.     Tesla has expended and will continue to expend significant sums of money that it otherwise would not have spent.  Such expenditures include, but are not limited to:

a) costs incurred in investigating and defending Tesla and certain officers in the Federal Securities Action, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

b) costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Tesla's artificially inflated stock price; and

c) costs incurred from the loss of the Company's customers' confidence in Tesla's services.

92.     As a result of the Individual Defendants' misconduct, Tesla's corporate image and goodwill have also been irreparably damaged.

**DEMAND IS FUTILE**

93.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.  Presently, the Board consists of the following six individuals: E. Musk, Buss, Ehrenpreis, Gracias, Jurvetson, and K. Musk.  Plaintiff did not make a demand on the Board to bring this action because such demand would be futile given the facts as alleged herein and, therefore, such a demand is excused.

94.     As specified herein, demand is excused because this Verified Shareholder Derivative Complaint alleges with particularity that at least half of the members of the current Board breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.  Indeed, during the relevant period the Individual Defendants caused or allowed the Company to fail to maintain proper internal controls and oversight mechanisms and to issue

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

false and misleading statements regarding the safety of its only vehicle for sale – the Model S. The Individual Defendants' misconduct has severely damaged the Company.  Lawsuits alleging violation of the federal securities laws have been filed against the Company.  Further, and more importantly, Tesla's reputation and goodwill have been tainted by the misconduct described herein.

95.     During the relevant period, the Audit Committee consisted of defendants Buss, Gracias and Jurveston, with defendant Buss the designated Audit Committee Financial Expert. Among other things, the Audit Committee is responsible for "reviewing the adequacy and effectiveness of Tesla's internal control policies and procedures"

96.     According to the Company's website, the Board:

…sets high standards for the Company's employees, officers and directors. Implicit in this philosophy is the importance of sound corporate governance.  It is the duty of the Board of Directors to serve as a prudent fiduciary for shareholders and to oversee the management of the Company's business. To fulfill its responsibilities and to discharge its duty, the Board of Directors follows the procedures and standards that are set forth in these guidelines.  These guidelines are subject to modification from time to time as the Board of Directors deems appropriate in the best interests of the Company or as required by applicable laws and regulations.

97.     In addition, by its Code of Ethics:

Each employee, officer and director should endeavor to respect the rights of and deal fairly with the Company's customers, suppliers, competitors and employees. No employee, officer or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice.

98.     In this vein, the Code of Ethics sets further specific policies as to the CEO:

The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by the Company with the SEC. Accordingly, it is the responsibility of the CEO and each senior financial officer promptly to bring to the attention of the Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings or otherwise assist the Disclosure Committee in fulfilling its responsibilities as specified in the Company's Disclosure Controls and Procedures Policy.

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

***

The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel or the Legal Department or the CEO and to the Audit Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of violation of the Code of Business Conduct and Ethics or of these additional procedures.

99.    Furthermore, the Company's policies with respect to external reporting and disclosure require the Audit Committee to review external reports (defined as SEC Forms 8-K, 10-Q, 10-K, Annual Meeting Materials, Quarterly Earnings Releases and Guidance, Investor and Other Presentations, and Routine Press Releases) prepared by the executive-level Disclosure Committee.

100.    The Board is also responsible for overseeing the major risks facing the Company:

The Board of Directors is responsible for overseeing the major risks facing the Company while management is responsible for assessing and mitigating the Company's risks on a day-to-day basis. In addition, the Board has delegated oversight of certain categories of risk to the Audit and Compensation Committees. The Audit Committee reviews and discusses with management significant financial and nonfinancial risk exposures and the steps management has taken to monitor, control and report such exposures. The Compensation Committee oversees management of risks relating to the Company's compensation plans and programs. In performing their oversight responsibilities, the Board and Audit Committee periodically discuss with management the Company's policies with respect to risk assessment and risk management. The Audit and Compensation Committees report to the Board as appropriate on matters that involve specific areas of risk that each Committee oversees.

101.    Despite their duties and responsibilities, the members of the Board and/or Audit Committee respectively, failed to ensure that the Company had adequate internal controls, policies and oversight mechanisms in place to prevent the wrongdoing alleged herein. As such, the Individual Defendants face a substantial threat of liability and cannot fairly consider a demand to commence litigation.

102.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on intentional,

reckless and disloyal misconduct. Thus, none of the Individual Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Individual Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

103.    Read together with the facts summarized above and alleged with particularity herein, pre-suit demand is also excused as futile for the following reasons:

(a)    The principal professional occupation of defendant E. Musk is his employment with Tesla, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. In 2012, in particular, E. Musk was paid salary, bonus, stock awards and stock options totaling $78,150,010. Furthermore, the Company admits that E. Musk is not independent in its Proxy Statement filed April 24, 2014. E. Musk owns 27% of the Company's shares.

(b)    The Individual Defendants concede that defendant K. Musk lacks independence as he is the brother of E. Musk. The familial relationship renders demand futile as to defendants E. Musk and K. Musk.

(c)    Defendant Gracias lacks independence as he is the chief executive officer and a director of Valor Management Corp. ("VMC") which is a minority investor of Space X where Gracias is a director and defendant E. Musk is the Chief Executive Officer, Chief Technology Officer, Chairman and a significant stockholder. Moreover, VMC is a minority investor in SolarCity where Gracias is also a director and of which E. Musk is the Chairman. Furthermore, The Elon Musk Revocable Trust dated July 22, 2003, is a limited partner of Valor Equity Partners, L.P., Valor Equity Partners II, L.P. and Valor Equity Partners III-A L.P., which

1 | are advised by VMC, with subscription commitments of $2 million, $2 million and $10 million,
2 | respectively.

3 |       (d)    Defendant Jurvetson lacks independence as he is a managing director of
4 | Draper Fisher Jurvetson ("DFJ").  DFJ funds are a significant stockholder of SpaceX and
5 | Jurvetson is a director of SpaceX.  As discussed *supra*, defendant E. Musk is the Chief Executive
6 | Officer, Chief Technology Officer, Chairman and a significant stockholder of SpaceX.
7 | Additionally, DFJ funds are a significant stockholder of SolarCity of which E. Musk is the
8 | Chairman.  The Elon Musk Revocable Trust dated July 22, 2003 is a limited partner of Draper
9 | Fisher Jurvetson Fund X, L.P., which is managed by DFJ, with a subscription commitment of
10 | $250,000.

11 |       (e)    Defendant Ehrenpreis lacks independence as he is a minority investor in
12 | SpaceX where defendant E. Musk is the Chief Executive Officer, Chief Technology Officer,
13 | Chairman and a significant stockholder.

14 |       (f)    Defendant Buss lacks independence as he is executive vice president of
15 | finance and administration and chief financial officer of Cypress. In 2013, Cypress provided
16 | semiconductors to a third party manufacturer engaged by Tesla to build certain components for
17 | use in its Model S vehicle. This indirect supply relationship continues in 2014.  Payments by
18 | Tesla to the third party manufacturer in respect of the semiconductors supplied by Cypress were
19 | approximately $605,000 in 2013 and are expected to be approximately $766,000 in 2014.

20 |       (g)    Defendants E. Musk, Jurvetson and Gracias further lack independence as a
21 | result of their business dealings in connection with Solar City and certain Solar City Agreements
22 | as described in the Proxy Statement filed on April 24, 2014.  The Proxy Statement states, in part,
23 | the following:

24 |     We have entered into a number of agreements with SolarCity. Mr. Elon Musk is a
25 | significant stockholder of SolarCity and has been its Chairman since July 2006.
    Mr. Jurvetson, a member of our Board of Directors, is a managing director of
26 |     Draper Fisher Jurvetson which is a significant stockholder of SolarCity. Mr.
    Gracias, a member of our Board of Directors, is a minor shareholder of SolarCity
27 |

28 | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

and a member of the board of directors of SolarCity. Mr. Straubel, our Chief Technical Officer, is a member of the board of directors of SolarCity.

In January 2011, we entered into a professional services agreement with SolarCity under which Tesla subcontracted with SolarCity for SolarCity to pay Tesla to provide a variety of design, engineering and consulting services as part of a grant under the California Solar Initiative of the California Public Utilities Commission. As of December 31, 2012, all work under this agreement has been completed. Pursuant to this agreement, payment of a portion of the billable amount was deferred until 2013. Accordingly, we recognized approximately $47,000 in revenue under this agreement in 2013.

In the past, we have engaged SolarCity from time to time to install our Superchargers and related equipment, including solar panels provided by SolarCity for use as part of the Superchargers. SolarCity has invoiced Tesla approximately $748,000 for such installation services and equipment provided by SolarCity during 2013.

In September 2012, we entered into a professional services agreement with SolarCity (the "Services Agreement") whereby we agreed to refer to SolarCity our customers who have indicated their intent to consult with SolarCity for the installation of in-home electric vehicle supply equipment for use with Tesla vehicles. Under this agreement, SolarCity agreed to pay us referral fees in respect of each customer who purchases from SolarCity solar photovoltaic equipment or energy efficiency upgrade services. During the 2013 fiscal year, approximately $27,000 in aggregate became payable to us by SolarCity for such referral fees. The Services Agreement did not provide for any payment obligations by Tesla. The Services Agreement expired in September 2013.

In April 2013, we entered into a supply agreement with SolarCity under which we will supply SolarCity with various sizes of stationary batteries for integration with solar panels by SolarCity to create stationary power sources for sale or lease to residential and commercial customers. We received approximately $1.6 million from SolarCity during fiscal year 2013 for stationary batteries we supplied to SolarCity pursuant to this supply agreement.

(h)     Defendants E. Musk, Jurvetson, K. Musk, and Gracias also lack independence as a result of their business dealings in connection with SpaceX and certain SpaceX Agreements as described in the Proxy Statement filed on April 24, 2014. The Proxy Statement states, in part, the following:

Elon Musk, our Chief Executive Officer, Product Architect and Chairman, is also the Chief Executive Officer and a significant stockholder of SpaceX. Steve Jurvetson and Kimbal Musk, two members of our Board of Directors, are also

members of the board of directors of SpaceX and Antonio Gracias, another member of our Board of Directors, holds a minority interest in SpaceX and is also a member of the board of directors of SpaceX. SpaceX has from time to time in the past paid for facilities and services expenses on our behalf, for which we subsequently reimbursed SpaceX. SpaceX has also provided us, at no cost, with use of certain enterprise software developed by it.

We also receive rental payments from SpaceX for leasing to SpaceX certain car parking spaces located in the south parking lot of our Los Angeles, CA Design Studio. During the 2013 fiscal year, we received approximately $19,000 in such rental payments.

In February 2014, Tesla and SpaceX entered into an agreement relating to Tesla's use of an aircraft leased and operated by SpaceX (the "Airplane Agreement"). Pursuant to the Airplane Agreement, Tesla will pay SpaceX for its use of the aircraft at rates to be determined by the parties from time to time, subject to rules of the Federal Aviation Administration governing such arrangements. The Airplane Agreement was retroactive to cover Tesla's use of the SpaceX aircraft beginning in September 2013. Tesla paid SpaceX approximately $229,000 under the Airplane Use Agreement for Tesla's use of the plane in 2013.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duty)

104.   Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

105.   Each of the Individual Defendants owed the Company and its shareholders the highest duties of loyalty, good faith, honesty, and care in conducting their affairs and the business of the Company.

106.   Under the current circumstances, the Individual Defendants also had a duty to:

(a)   act in the interests of the Company and all of its equity owners; and

(b)   act in accordance with the fundamental duties of loyalty, care and good faith.

107.   Because of their respective positions with the Company, the Individual Defendants also are required to:

(a)     act independently to ensure that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder; and

(b)     ensure that if there are conflicts of interest between the Individual Defendants' interests and their fiduciary obligations of loyalty, that they are resolved in the best interest of the Company and its public shareholders

108.    In causing or allowing the Company to fail to maintain adequate internal controls and procedures related to public disclosures, the Individual Defendants have not taken any steps to protect the interests of the Company and, in fact, have breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

109.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in improper practices.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

110.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Tesla has sustained significant damages.

111.    Accordingly, Plaintiff, as a shareholder of the Company, seeks monetary damages, injunctive remedies, and other forms of equitable relief on Tesla's behalf.

112.    Plaintiff and the Company have no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment as follows:

A.     Authorizing the maintenance of this action as a derivative action, with Plaintiff as the derivative Lead Plaintiff;

B.     Declaring that the Individual Defendants have violated their fiduciary duties to the Company;

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

C.     Awarding compensatory damages against defendants individually and severally in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

D.     Directing Tesla to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Tesla and its shareholders from a repeat of the damaging events that occurred during the relevant time period, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)     a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)     a provision to permit shareholders of Tesla to nominate at least three candidates for election to the Board; and

(iii)     appropriately test and then strengthen the internal compliance and control functions;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable allowances for Plaintiff's attorneys' and experts' fees and expenses; and

F.     Granting such other or further relief as may be just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

35

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1  Dated: June 18, 2014

**THE ALEXANDER FIRM P.C.**
**A Professional Law Corporation**

2

3

By:/s/*Vahn Alexander*
    Vahn Alexander (167373)

4

5

6

1875 Century Park East, Suite 700
Los Angeles, CA  90067
Telephone: (310) 407-5335
Facsimile: (310) 407-5338
Email: info@alexanderfirmpc.com

7

8

9

10

11

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
2 Righter Parkway, Ste. 120
Wilmington, DE  19803
Telephone: (302) 295-5305
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com

12

13

14

15

**HYNES KELLER & HERNANDEZ, LLC**
Beth A. Keller
100 South Bedford Road, Ste. 340
Mount Kisco, NY  10549
Telephone: (914) 752-3040
Facsimile: (914) 752-3041
Email: bkeller@hkh-lawfirm.com

16

17

18

19

20

21

**LAW OFFICE OF DEBRA S.**
**GOODMAN P.C.**
Debra Goodman
1301 Skippack Pike
Suite 7A #133
Blue Bell, PA  19422
Telephone: (610) 277-6057
Facsimile: (484) 231-1922
Email: dg@dsgoodmanlaw.com

22

*Attorneys for Plaintiff*

23

24

25

26

27

28

36
**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## **VERIFICATION**

I, Ross Weintraub, am the plaintiff in the within action and a citizen of Pennsylvania. I have read the foregoing Verified Shareholder Derivative Complaint and know the contents thereof, except as to the matters stated therein to be alleged on information and belief, and as to those matters, I believe them to be true.

June 17, 2014

_____
Ross Weintraub